# IN THE SUPREME COURT OF IOWA

No. 16–1665

Filed November 30, 2018

**STATE OF IOWA,**

Appellee,

vs.

**DARRYL B. SHEARS JR.,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Mary E. Howes, Judge.

Darryl Shears Jr. seeks further review of an order requiring him to pay restitution. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, Ashley Stewart and Shellie L. Knipfer, Assistant Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Israel Kodiaga and Kelli A. Huser (until withdrawal), Assistant Attorneys General, Michael J. Walton, County Attorney, and Joshua R. Sims and Kelly G. Cunningham, Assistant County Attorneys, for appellee.

**APPEL, Justice.**

In this case, we consider whether the City of Davenport is entitled to restitution for damage to patrol vehicles in a criminal case. The defendant pled guilty to criminal mischief and eluding an officer. After acceptance of the guilty plea, the city filed a restitution claim totaling approximately $7,093 for damage to its police vehicles. The district court determined that the damages sought by the city were a result of the defendant's criminal activity and ordered the defendant to pay restitution to the city.

For the reasons expressed below, we affirm.

## I. Factual and Procedural Background.

The State charged Darryl Shears with three crimes: criminal mischief in the second degree in violation of Iowa Code sections 716.1 and 716.4(1) (2015), possession of a controlled substance, second offense, in violation of Iowa Code section 124.401(5), and eluding while participating in a public offense in violation of Iowa Code section 321.279(3)(*a*).

Pursuant to a plea agreement, Shears pled guilty to criminal mischief and to eluding under Iowa Code section 321.279(2), a lesser included offense of the original charge of eluding while participating in a public offense.

After the court accepted the plea agreement and sentenced Shears, the district court held a restitution hearing. At the restitution hearing, the district court found that Shears had to reimburse the State for damages to the patrol vehicles in the amount of approximately $7,093. On appeal, Shears challenges the restitution ruling of the district court.

## II. Standard of Review.

Restitution orders are reviewed for errors of law. *State v. Dubois*, 888 N.W.2d 52, 53 (Iowa 2016); *State v. Jenkins*, 788 N.W.2d 640, 642

(Iowa 2010); *State v. Klawonn*, 688 N.W.2d 271, 274 (Iowa 2004). On appeal, we are bound by the district court's findings of fact so long as they are supported by substantial evidence. *State v. Paxton*, 674 N.W.2d 106, 108 (Iowa 2004). The district court is afforded broad discretion in determining the amount of restitution when the record contains proof of a reasonable basis from which the amount may be inferred. *See State v. Watts*, 587 N.W.2d 750, 752 (Iowa 1998).

### III. Discussion.

**A. Introduction.** Restitution as part of a criminal action is a relatively recent development in the law. Traditionally, recovery of damages sustained by victims was not part of the criminal proceeding. A victim who suffered economic harm as a result of a crime was required to pursue recovery in a civil action. With the spread of the victim's rights movement in the 1980s, legislatures—including Iowa's—enacted statutes that provided for at least partial recovery by victims of economic harm as restitution in the sentencing phase of the criminal proceeding. *See Jenkins*, 788 N.W.2d at 642. In addition to state criminal restitution statutes, the Victim and Witness Protection Act and the Mandatory Victims Restitution Act have provided for criminal restitution in federal proceedings. *Id.*; *see* 18 U.S.C. §§ 3663–3663A (2012).

The purpose of these criminal restitution statutes is said to include protecting the public by compensating victims for criminal activities and rehabilitating the offender by instilling responsibility in the offender. *See State v. Izzolena*, 609 N.W.2d 541, 548 (Iowa 2000); *State v. Kluesner*, 389 N.W.2d 370, 372 (Iowa 1986).

Analytically, criminal restitution is an odd duck that is hard to categorize. *See State v. Mayberry*, 415 N.W.2d 644, 646 (Iowa 1987) (noting that it is not entirely clear whether an order of restitution is a fine,

a civil claim, or a hybrid). It arises in the context of a criminal proceeding designed to punish the offender. *See Jenkins*, 788 N.W.2d at 643 (stating that restitution under Iowa Code chapter 910 is a "criminal sanction"); *State v. Holmberg*, 449 N.W.2d 376, 377 n.1 (Iowa 1989) (noting tort and criminal purposes). As a result, criminal restitution obligations have been held nondischargeable in bankruptcy. *Kelly v. Robinson*, 479 U.S. 36, 44–53, 107 S. Ct. 353, 358–63 (1986). Further, restitution is subject to the Excessive Fines Clauses of the Eighth Amendment of the United States Constitution and article I, section 17 of the Iowa Constitution. *Izzolena*, 609 N.W.2d at 549; *see also Paroline v. United States*, 572 U.S. 434, 455–56, 134 S. Ct. 1710, 1725–26 (2014) (stating that restitution may come within the purview of the Excessive Fines Clause because it is imposed by the government after a criminal conviction and serves punitive purposes). Yet, criminal restitution seeks to provide compensation to those damaged by the defendant's conduct, ordinarily a civil goal. *See Mayberry*, 415 N.W.2d at 645–46. There has been a tug-of-war among commentators whether to characterize restitution as criminal, and thus subject to generally narrow construction, or civil, and thereby subject to a more generous remedial interpretation but arguably subject to defenses available in civil actions.[1] *See* Bridgett N. Shephard, Note & Comment, *Classifying Crime Victim Restitution: The Theoretical Arguments and Practical Consequences of Labeling Restitution as Either a Criminal or Civil Law Concept*, 18 Lewis & Clark L. Rev. 801, 802–03, 808 (2014).

Because of the ambiguous nature of restitution, the courts have struggled with questions related to the scope of criminal restitution.

---

[1]The court of appeals has ruled that concepts of comparative fault do not apply to criminal restitution. *State v. Wagner*, 484 N.W.2d 212, 216 (Iowa Ct. App. 1992). A California appellate court has come to an opposite conclusion. *People v. Millard*, 95 Cal. Rptr. 3d 751, 757 (Ct. App. 2009).

Among other things, courts have pondered on the question of who is a "victim" for purposes of criminal restitution. For example, one of the frequently litigated issues is whether a government entity may be considered a victim for purposes of criminal restitution. *See generally* Kimberly J. Winbush, Annotation, *Persons or Entities Entitled to Restitution as "Victim" Under State Criminal Restitution Statute*, 92 A.L.R. 5th 35 (2001). Similarly, courts have grappled with the question of whether causation in criminal restitution matters should be narrowly limited to causation ordinarily applied in criminal cases or whether the causation required for criminal restitution should be the same as that in an ordinary civil action. Ultimately, the questions of determining who is a victim of the crime and of causation raise questions of statutory interpretation. This case requires us to consider these questions in the context of the Iowa statutory framework establishing criminal restitution.[2]

**B. Iowa Criminal Restitution Framework.** We now turn to the language and structure of the Iowa criminal restitution statute, Iowa Code

---

[2]There is a body of literature suggesting that there may be constitutional issues lurking behind restitution statutes. *See, e.g.*, Fern L. Kletter, Annotation, *Mandatory Victims Restitution Act—Constitutional Issues*, 20 A.L.R. Fed. 2d 239 (2007). Emphasizing the similarity of restitution to civil actions, some authorities have suggested that liability arising from restitution improperly invades the right to a jury trial in civil cases. *See* Bonnie Arnett Von Roeder, Note, *The Right to a Jury Trial to Determine Restitution Under the Victim and Witness Protection Act of 1982*, 63 Tex. L. Rev. 671, 673–74 (1984). On the other hand, emphasizing the criminal nature of restitution, some authorities have suggested that a determination of restitution by the court, and not a jury, violates *Apprendi. v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). *See, e.g.*, James Barta, Note, *Guarding the Rights of the Accused and Accuser: The Jury's Role in Awarding Criminal Restitution Under the Sixth Amendment*, 51 Am. Crim. L. Rev. 463, 463–64 (2014). In the pre-*Apprendi* case of *Mayberry*, 415 N.W.2d at 647, we rejected a claim that a defendant was entitled to a jury trial on restitution issues under the Sixth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. We have also rejected a facial excessive fines challenge, double jeopardy challenge, and a due process challenge to criminal restitution. *Izzolena*, 609 N.W.2d at 547–53. No state or federal constitutional issues have been presented by the parties in this case.

chapter 910. *See McGill v. Fish*, 790 N.W.2d 113, 118 (Iowa 2010) ("[T]he statute in dispute is our starting point . . . .").

At the outset, the Iowa criminal restitution statute provides that in all cases where the defendant pled or is found guilty, the sentencing court "shall order that restitution be made by each offender to the victims of the offender's criminal activities." Iowa Code § 910.2(1). The imposition of restitution in a criminal matter is thus a mandatory requirement of Iowa law. *State v. Jackson*, 601 N.W.2d 354, 356 (Iowa 1999); *Watts*, 587 N.W.2d at 751. Determining the amount of restitution, however, is in the sound discretion of the court. *See Watts*, 587 N.W.2d at 752; *State v. Blank*, 570 N.W.2d 924, 926–27 (Iowa 1997) (per curiam); *State v. Haines*, 360 N.W.2d 791, 797 (Iowa 1985).

The burden is on the state to show entitlement to criminal restitution. *See State v. Tutor*, 538 N.W.2d 894, 897 (Iowa 1995). An offender may challenge the amount of restitution sought by the county attorney, including challenging a determination of an amount to be paid to a victim by the "Crime Victim Compensation Program." *Jenkins*, 788 N.W.2d at 646. Mere presentation of a bill from a third party does not establish damages sustained by a victim. *State v. Bonstetter*, 637 N.W.2d 161, 169–70 (Iowa 2001). The state must produce evidence on the amount of damages sought in restitution. *Holmberg*, 449 N.W.2d at 377–78.

The total amount of restitution, however, is not immediately payable as in a civil judgment, but instead is subject to an order or payment based on ability to pay. The limitation of payment of restitution according to ability to pay removes restitution from a facial challenge as an excessive fine. *See Goodrich v. State*, 608 N.W.2d 774, 776 (Iowa 2000); *State v. Wagner*, 484 N.W.2d 212, 216 (Iowa Ct. App. 1992).

The legislature provided a number of interlocking definitions in the statute to delineate the scope of mandatory criminal restitution. The legislature provided a definition of "pecuniary damages" available to a victim in Iowa Code section 910.1(3). The provision states that pecuniary damages means "all damages . . . which a victim could recover against the offender in a civil action arising out of the same facts or event." Iowa Code § 910.1(3). The provision also provides that, "[w]ithout limitation, *'pecuniary damages'* includes damages for wrongful death and expenses incurred for psychiatric or psychological services or counseling or other counseling for the victim which became necessary as a direct result of the criminal activity." *Id.* The provision provides, however, that the term "pecuniary damages" does not include damages paid by an insurer on an insurance claim by the victim; punitive damages; and damages for pain, suffering, mental anguish, and loss of consortium. *Id.*

The relationship between an award of criminal restitution for pecuniary damages for "all damages . . . which a victim could recover against the offender in a civil action arising out of the same facts or event," *id.*, and any subsequent civil action is addressed in Iowa Code section 910.8. According to this section, a victim, after receiving criminal restitution, may bring a subsequent action for damages against the offender. *Id.* § 910.8. Any award of criminal restitution, however, is an offset against any subsequent civil judgment that the victim might obtain. *Id.*; *see Teggatz v. Ringleb,* 610 N.W.2d 527, 530–32 (Iowa 2000).

The legislature provided a definition of "restitution." Iowa Code § 910.1(4). According to this provision, restitution means "payment of pecuniary damages to a victim in an amount and in the manner provided by the offender's plan of restitution." *Id.* In addition, the legislature declares that restitution includes various fines, surcharges, penalties,

costs, and "payment of restitution to public agencies pursuant to section 321J.2, subsection 13, paragraph '*b.*' " *Id.*

Iowa Code section 321J.2(13)(*b*) provides that a court "may" order restitution paid to any public agency for the cost of emergency response resulting from drunk driving violations. *Id.* § 321J.2(13)(*b*). The provision defines emergency response as "any incident requiring response by fire fighting, law enforcement, ambulance, medical, or other emergency services." *Id.* The amount of restitution that may be recovered for emergency response in drunk driving cases is capped at $500 per public agency. *Id.* The provision directs that "[a] public agency seeking such restitution shall consult with the county attorney regarding the expenses incurred by the public agency, and the county attorney may include the expenses in the statement of pecuniary damages pursuant to section 910.3." *Id.*

The legislature also provided a definition of "victim" in Iowa Code section 910.1(5). Generally, a victim is defined as "a person who has suffered pecuniary damages as a result of the offender's criminal activities." *Id.* § 910.1(5). Finally, section 910.1(5) provides that the crime victim compensation program is not an insurer and that its right of subrogation does not "prohibit" restitution to the program. *Id.*

We have stated that because criminal restitution is penal in nature, the provisions of Iowa Code chapter 910 should be interpreted strictly. *See Bonstetter*, 637 N.W.2d at 166. We have also stated in passing that the rule of lenity is applicable to criminal restitution. *See State v. Hagen*, 840 N.W.2d 140, 146 (Iowa 2013). Yet, we have suggested that it is appropriate to consider a broader interpretation of restitution provisions because the purpose of the statute is to protect the public. *See Kluesner*, 389 N.W.2d at 372–73. We have thus held, for example, that the amount of restitution

ordered is not limited by the parameters of the offense for which the defendant enters a guilty plea. *See Watts*, 587 N.W.2d at 751.

**C. Positions of the Parties.** On appeal, Shears claims that the district court erred in awarding criminal restitution to the City of Davenport for the damage to its police vehicles. Shears concedes that the Davenport police vehicles incurred damage when the officers attempted to stop him. Further, Shears does not challenge the amount of damage to the vehicles. Shears asserts, however, that the damage was not caused *by him*, but instead was caused by the actions of the officers trying to stop him.

Shears believes that entitlement to restitutionary damages should be limited to damages caused by a defendant's criminal conduct. Shears's causation theory is based on the scope-of-liability standard for causation applicable in civil actions, *see Thompson v. Kaczinski*, 774 N.W.2d 829, 839 (Iowa 2009), because, as Shears acknowledges, the damages a victim may recover through restitution are limited by principles applicable in civil actions. Shears, however, does not evaluate whether the damage to the patrol vehicles at issue here is within the range of harms risked by his conduct. *See id.* at 837–39. Rather, Shears simply states that his criminal conduct was not causing damage to the vehicles. He also invokes a parade of horribles in cautioning against extending the line for restitutionary damages to those incurred by law enforcement in carrying out their duties.

In support of his causation theory, Shears points to two Wisconsin cases. First, Shears cites *State v. Haase*, 716 N.W.2d 526 (Wis. Ct. App. 2006). In *Haase*, the state sought to recover the loss of a law enforcement vehicle that had burst into flames after chasing a defendant who was eluding officers. *Id.* at 528. Shears notes that the *Haase* court held the defendant's criminal conduct did not cause harm to the property of the

county sheriff's department. *See id.* at 530. As a result, the *Haase* court concluded that the county was not the direct victim of the defendant's conduct and, consequently, not entitled to restitution. *Id.* Shears also cites a second Wisconsin appellate court case, *State v. Storlie*, 647 N.W.2d 926 (Wis. Ct. App. 2002). In that case, the Wisconsin appellate court held the state was not entitled to damages for stop sticks used in the normal course of law enforcement. *Id.* at 929. Reasoning from these cases, Shears asserts that the crime of eluding does not have a victim and that Shears's eluding did not cause the damage to the police vehicles.

The State agrees that in order for criminal restitution to be proper, there must be "a causal connection between the established criminal act and the injuries to the victim." *Holmberg*, 449 N.W.2d at 377. The State urges that in criminal restitution matters, we should apply the causation standard of a tort case as applied under *Thompson*, 774 N.W.2d at 838, rather than a narrower concept of causation that might be applied in criminal cases.

Under the causation standard of a tort case, the State presses several reasons why the damage to the police vehicles was within the range of harms risked by Shears's conduct. The State argues that it was foreseeable that police officers would hit Shears's car to try to stop him because Shears's high speed and disregard of stop signals posed a hazard to pedestrians and other drivers. In addition, police had tried using their lights, sirens, and spike strips to stop Shears without success.

The State cites two federal appellate cases for the proposition that harms caused by flight are caused by the underlying crime. *See United States v. Washington*, 434 F.3d 1265, 1268–70 (11th Cir. 2006) (affirming, under clearly erroneous review standard, district court's conclusion that harm from flight is causally related to robbery); *United States v. Reichow*,

416 F.3d 802, 804–05 (8th Cir. 2005). Applying these precedents, the State argues that damage to police cars from a chase of a fleeing suspect is recoverable under Iowa's restitution statute.

The State also distinguishes the Wisconsin appellate precedent cited by Shears. The State acknowledges that in *Storlie*, the court emphasized that a government entity cannot recover restitution for "collateral expenses incurred in the normal course of law enforcement." 647 N.W.2d at 927, 929. As a result, the cost of stop sticks, which were used as intended in the pursuit of the suspect, could not be recovered as restitution. *Id.* However, the State points out, the *Storlie* court distinguished stop sticks from a patrol car. According to the *Storlie* court, "[w]hile a patrol car is a tool of law enforcement, it is not deployed for the purpose that it be run over and destroyed, like stop sticks." *Id.* at 929.

The State further seeks to distinguish *Haase* or, in the alternative, suggests that *Haase* should not be followed. The State notes that the *Haase* court distinguished between direct harm, such as when a defendant vandalized equipment belonging to the state, and indirect harm, such as overtime costs incurred in a police standoff. *See Haase*, 716 N.W.2d at 530. According to the State, such a distinction between direct and indirect harm should not be embraced by this court.

**D. Iowa Criminal Restitution Caselaw.** There are no Iowa cases directly dealing with the ability of a government entity to recover pecuniary damages under Iowa Code chapter 910 when police cars were damaged in a high-speed chase involving the crime of eluding. There are, however, precedents that brush on the periphery of the precise legal issues posed in this case.

Generally, when ordering restitution, a court must first identify the "victim" entitled to compensation. *Bonstetter*, 637 N.W.2d at 165. On the

question of whether a government entity can be a victim under Iowa's criminal restitution statute, we have answered the question in the affirmative. For instance, in *Hagen*, we held that the state is a victim when the offender was guilty of willful failure to pay taxes. 840 N.W.2d at 146–48. We emphasized that under the Iowa statute, criminal restitution was available to any "person." *Id.* at 147–48. We noted in *Hagen* that the term "person" was not defined in the statute. *Id.* at 147. As a result, we relied upon the general definition of person in Iowa Code section 4.1. *Id.* Under Iowa Code section 4.1, the term "person" includes government entities. *Id.* Because the government was a victim of the crime of willful failure to pay income tax, we held in *Hagen* that the government was entitled to restitution. *Id.* at 147–48. Even if the state may be a victim under the Iowa criminal restitution statute, however, it still has the burden of showing causation. *See id.* at 148.

Also instructive is *State v. Taylor*, 506 N.W.2d 767 (Iowa 1993). In *Taylor*, we held that an offender who pled guilty to theft and falsifying public documents could be required to pay the University of Iowa for the cost of an audit to determine the amount of theft. *Id.* at 768–69. We noted that although the expenses of a civil suit are ordinarily not recoverable, in conversion cases the reasonable and necessary expenses incurred in recovering the property are a proper element of the damage award. *Id.* at 768.

The state, however, has not always been found a victim under our criminal restitution statute. For example, in *State v. Stewart*, 778 N.W.2d 62, 64–65 (Iowa Ct. App. 2009), the court of appeals held that the state was not entitled to recover, as criminal restitution, Medicaid payments made for the treatment of an assault victim. According to the court of appeals, the state was not a victim because the payment of Medicaid

benefits was not "a direct economic loss as a result of the crime." *Id.* at 64.

A number of our cases have explored the contours of causation required under Iowa Code chapter 910. Not surprisingly in light of the definition of "pecuniary damages" in Iowa Code section 910.1(3), our cases repeatedly reference potential liability under tort law.

For instance, in *State v. Starkey*, 437 N.W.2d 573, 573 (Iowa 1989), we considered whether restitution was appropriate in a case involving a hit-and-run driver. In *Starkey*, a motorist who had been drinking hit the victim who was parked along a highway changing a tire and fled from the scene. *Id.* The motorist pled guilty to leaving the scene of the accident. *Id.* The issue before us was whether the offender should pay restitution for the medical costs incurred by the injured tire changer. *Id.* at 574.

The *Starkey* court emphasized that under Iowa Code section 910.1, a victim must "prove a prima facie case of liability premised on some civil theory." *Id.* at 574. The *Starkey* court further noted that in order to support a civil theory of liability, proximate cause would be a necessary element. *Id.* The *Starkey* court found that there was no evidence in the record to show that the act of leaving the scene of the accident, the criminal offense charged, "either caused or aggravated the victim's injuries." *Id.* at 575.

Similarly, in *Holmberg*, 449 N.W.2d at 376, we considered whether a victim was entitled to restitution for computer theft. We emphasized the causation language in Iowa Code section 910.1(5), noting that restitution "must rest on a causal connection between the established criminal act and the injuries to the victim" and that restitution "can be extended to any amount which would be appropriate for tort recovery." *Id.* at 377. The burden, however, remained with the victim to prove that the evidence

supported the restitution claim. *See id.* at 377–78. We determined that while the evidence could support a conclusion that the victim suffered the claimed damages, "there was a wholesale failure of proof that this defendant was the one responsible for it." *Id.*

Finally, we used similar reasoning in *Bonstetter,* 637 N.W.2d at 168. In *Bonstetter*, the offender was found guilty of first-degree fraudulent practice and forgery. *Id.* at 164. The offender challenged the state's claim for restitution of the cost of an audit to determine the scope of the offender's criminal activity. *Id.* We held that the reasonable and necessary cost of the audit was a proper element of damage in conversion cases. *Id.* at 168–69. We cited in passing a New Mexico case for the proposition that "a reasonably foreseeable consequence" of taking money from a government entity was that there would be a need to conduct a thorough audit to uncover the extent of the defalcations. *Id.* at 169 (citing *State v. Whitaker,* 797 P.2d 275, 284 (N.M. Ct. App. 1990)). In a footnote, we specifically emphasized that in a civil case involving conversion, the cost of an audit is an element of damages and is not similar to costs expended in preparing a civil lawsuit. *Id.* at 168 n.2.

Our criminal restitution cases have sometimes emphasized that the criminal offense was a "direct cause" of the claimed pecuniary injury. For example, in *Hagen*, 840 N.W.2d at 148, we noted that there was "a direct causal relationship" between the crime of willful failure to file taxes and lost revenue to the state. In *State v. Knudsen,* 746 N.W.2d 608, 610 (Iowa Ct. App. 2008), the court of appeals distinguished "[d]amages that are a direct result of the defendant's criminal act" from expenses associated with prosecution. A similar verbal formulation was utilized in *State v. Stessman,* 460 N.W.2d 461, 464 (Iowa 1990), where we stated that General Motors was a victim in an odometer fraud case because the "defendant's

actions caused direct financial harm to General Motors." And, in *Stewart*, 778 N.W.2d at 64, the court of appeals emphasized that the state had not suffered a "direct economic loss as a result of the crime." What is meant by the term "direct causation" is not explicitly explained in these cases.

**E. Criminal Restitution Caselaw from Other Jurisdictions Dealing with Damage to Police Vehicles.** There are a substantial number of state cases that consider whether a police department may be considered a victim under various criminal restitution statutes. A number of cases have held that state law enforcement agencies are not victims under criminal restitution statutes. *See, e.g.*, *People v. Chaney*, 544 N.E.2d 90, 91 (Ill. App. Ct. 1989); *People v. Evans*, 461 N.E.2d 634, 639 (Ill. App. Ct. 1984); *Igbinovia v. State*, 895 P.2d 1304, 1308–09 (Nev. 1995); *State v. Evans*, 512 N.W.2d 259, 261 (Wis. Ct. App. 1994). For example, in *People v. Evans*, the court emphasized that the state cannot be considered a "victim" to the extent that normal operating costs are expended by police agencies. 461 N.E.2d at 639. Another verbal formulation was offered in *Igbinovia*, where the Nevada court emphasized that the notion of a "victim," which was not specifically defined in Nevada's criminal restitution statute, implied "a passive sufferer of harm."[3] 895 P.2d at 1308. The *Igbinovia* court recognized, however, that a different result might occur in the face of a more expansive legislative definition of the term "victim." *Id.* at 1308–09. The "rationale of these opinions is that a law enforcement agency ought not be compensated for the public money that it spends in performing its basic function of investigating and solving crimes." *People v. Danenberger*, 848 N.E.2d 637, 644 (Ill. App. Ct. 2006).

---

[3]*See also State v. Sprecher*, 606 N.W.2d 138, 139 (S.D. 2000) (holding county not a victim because it did not own property that was subject of criminal public nuisance and county could not place itself in the status of victim by taking affirmative action to abate nuisance).

Yet, in *Dubois v. People*, 211 P.3d 41, 42 (Colo. 2009) (en banc), a police car crashed en route to respond to another deputy's call for assistance. The fighting issue in the case was whether the police agency and the driver of the car were victims under the Colorado criminal restitution statute. *See id.*

The *Dubois* court determined that the police agency and the driver were victims for purposes of criminal restitution. *Id.* The *Dubois* court emphasized that under the Colorado statute governing vehicular eluding, the crime is committed against a specific person, namely, a peace officer. *Id.* at 45. The *Dubois* court emphasized that if the statute did not identify a peace officer as a victim, restitution might not have been available. *Id.* at 45–46.

On the question of causation, we have uncovered several state court cases dealing with efforts of police departments to obtain restitution from damage to police vehicles. The first case is *State v. Dillon*, 637 P.2d 602 (Or. 1981). In this case, the defendant refused to stop his car when directed to do so by police, and a high-speed chase ensued. *Id.* at 604. The defendant's car eventually was boxed in by police cars. *Id.* The defendant backed into one of the police cars, smashing it. *Id.* When told to get out of the car, the defendant drove his car into a police officer, striking him in the knee. *Id.* The police officer fired at the defendant, striking him in the face. *Id.* The defendant received medical treatment for his wounds, which were paid for by the Oregon Department of Human Resources. *Id.* One of the squad cars was also damaged by gunfire. *Id.*

The *Dillon* court considered whether (1) the damage to a police vehicle bashed by the defendant, (2) the damage to another police vehicle as a result of gunfire at the scene, and (3) the costs incurred by the state in providing medical services to the defendant were recoverable under

Oregon's criminal restitution statute. *See id.* The applicable Oregon criminal restitution statute provided that a court could order restitution "[w]hen a person is convicted of criminal activities which have resulted in pecuniary damages." *Id.* at 608 (quoting Or. Rev. Stat. § 137.106(1) (enacted 1977)).

The *Dillon* court first addressed whether the damage to the police car caused by the defendant's vehicle was subject to restitution. *Id.* The *Dillon* court noted that the "[d]efendant's criminal mischief directly caused the damage to the police car which he bashed." *Id.*

The *Dillon* court next turned to the damage to the police vehicle due to gunshots and the defendant's medical bills paid for by the state. *Id.* With respect to the damage to the police vehicle from gunshots, the *Dillon* court upheld restitution because the damage was recoverable "in a civil action arising out of the facts or events constituting the criminal activity." *Id.* at 609. The *Dillon* court came to a contrary conclusion regarding the medical expenses, observing that there were no facts giving rise to a theory of civil liability under which the state could recover the defendant's medical expenses. *Id.*

More recently, an Oregon appellate court reviewed a decision to impose restitution on a defendant for damage to a police vehicle following an officer's execution of a "pursuit intervention technique," or PIT, maneuver. *State v. Parsons*, 403 P.3d 497, 501–02 (Or. Ct. App. 2017), *as modified by* 403 P.3d 834, 834–35 (Or. Ct. App. 2017) (per curiam), *and rev. denied*, 362 Or. 545 (2018). The defendant argued that the trial court erred in imposing restitution for the damage to the patrol car because the damage was not a "reasonably foreseeable" result of his criminal conduct. *Id.* at 501. The appellate court concluded that the trial court did not make the required finding on whether the damage was reasonably foreseeable

and remanded to the trial court to make that finding in the first instance. *Id.* at 501–02.

Another criminal restitution case involving recovery of damages to a police car is *People v. Barnett,* 654 N.Y.S.2d 918, 919 (App. Div. 1997). The court in this case held that restitution for damage to a police car was not a reimbursement for normal, voluntarily incurred operating costs; instead, the restitution "covered the cost of repairing a police car that was damaged as a direct result of defendant's criminal conduct." *Id.* As a result, the police department was entitled to restitution for damages. *Id.* Similarly, in *People v. McCarthy,* 921 N.Y.S.2d 755, 757 (App. Div. 2011), the New York court upheld criminal restitution to a police department where the defendant drove head-on into a marked police vehicle. The *McCarthy* court followed *Barnett,* determining that restitution was proper because it reflected the cost of repairing a police vehicle damaged as a direct result of the defendant's criminal conduct. *Id.* (citing *Barnett,* 654 N.Y.S.2d 918).

Similarly, in *People v. Ford,* 49 N.E.3d 954, 960 (Ill. App. Ct. 2016), an Illinois appellate court considered whether a law enforcement agency was entitled to restitution related to damage caused to a police van by a defendant charged with reckless conduct. The Illinois appellate court held that restitution for the damage was appropriate. *Id.* The court recognized that "the vast weight of authority" stands for the proposition that government entities were not a victim within the meaning of Illinois restitution statute, but noted that the restitution in this case did not reimburse the police "for its normal costs of investigating crime." *Id.* at 959–60.

There is also federal court authority under federal criminal restitution statutes that may provide us with insight. In *United States v.*

*Donaby*, 349 F.3d 1046, 1047–48 (7th Cir. 2003), the court considered a bank robbery case where the offender attempted to evade pursuit through a high-speed chase. After hearing about the fleeing suspect on the radio, a police officer from the Village of Shiloh engaged in pursuit. *Id.* at 1048. The vehicle driven by the officer was damaged during the chase. *Id.* Shiloh sought criminal restitution for its damaged police vehicle under the Mandatory Victims Restitution Act. *See id.* at 1052 (citing 18 U.S.C. § 3663A(a)). Under the federal statute, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense . . . ." *See id.* (quoting 18 U.S.C. § 3663A(a)(2)).

According to the *Donaby* court, the district court correctly ruled that the bank robbery "directly and proximately led to the high-speed chase and the property damage that ensued." *Id.* at 1053. The *Donaby* court reasoned that the need to elude the police after the robbery is "a likely and foreseeable outcome of the crime." *Id.* at 1054; *see also Washington,* 434 F.3d at 1267–70 (holding that restitution is proper in bank robbery case involving fleeing suspect where law enforcement claimed damage to pursuing vehicle); *Reichow,* 416 F.3d at 804–05 (same).

**F. Discussion.**

1. *Government entities as victim.* At the outset, we believe that a government entity may, under the right circumstances, be a victim under the Iowa criminal restitution statute under our precedents. *See Hagen,* 840 N.W.2d at 146–48; *Taylor,* 506 N.W.2d at 768–69. Criminal restitution is particularly appropriate when government is the target of crime. 6 Wayne R. LaFave et al., *Criminal Procedure* § 26.6(c), at 1070 (4th ed. 2015). There may well be, of course, situations in which a government entity is not entitled to recover because causation is not established. *See, e.g., Holmberg,* 449 N.W.2d at 377–78; *Starkey,* 437 N.W.2d at 574–75.

But the language in the Iowa criminal restitution statute provides no bar against recovery by government entities. We decline to supply one.

2. *Standard of causation in tort.* We also think it plain, as a general matter, that the standard of causation generally applicable in civil matters controls the scope of restitution under the statute. Although we have declared that the Iowa criminal restitution statute should be construed strictly, the explicit language used by the legislature in the definition of pecuniary damages in Iowa Code section 910.1(3) prevents the adoption of a narrow gloss on causation. Because of the explicit statutory language, it is not surprising that many of our criminal restitution cases employ the causation test applicable in ordinary tort settings. *See Bonstetter*, 637 N.W.2d at 168–70; *Holmberg*, 449 N.W.2d at 377.

It is true that, along with the court of appeals, we sometimes have used language suggesting that "direct causation" is required to support a claim of criminal restitution. *See Hagen*, 840 N.W.2d at 148; *Stessman*, 460 N.W.2d at 464; *Stewart* 778 N.W.2d at 64; *Knudsen*, 746 N.W.2d at 610. We do not regard this language in these cases as suggesting a narrower concept of criminal causation that differs from tort law. Such an interpretation would be contrary to the express language of Iowa Code section 910.1(3) incorporating civil liability standards into the definition of pecuniary damages. Rather, we regard the language as reflecting the ordinary principle of tort law embraced since the days of *Palsgraf*, namely, that under certain circumstances, damage may be so attenuated or removed from the wrongful act that causation in tort simply cannot be found. *See Palsgraf v. Long Island R.R.*, 162 N.E. 99, 103–04 (N.Y. 1928) (Andrews, J., dissenting); *see also Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007) (discussing "legal cause"); *Benn v. Thomas*, 512 N.W.2d 537, 539–40 (Iowa 1994) (noting that courts ordinarily require foreseeability as a

limit to the existence of proximate cause in a tort claim). We thus proceed to consider whether, under our tort law, the city could recover damages against Shears for the damage to the police vehicle.

While we believe that damage to a police vehicle is generally recoverable under either the Restatement (Third) of Torts: Liability for Physical & Emotional Harm (Am. Law Inst. 2010) [hereinafter Restatement (Third) of Torts], or prior tort law, we consider three concepts that might undermine our conclusion: intervening or superseding cause, the so-called firefighter's rule, and language in the Iowa criminal restitution statute specifically authorizing but capping payment of emergency response costs by government.

3. *Frozen or dynamic application of tort law.* While the legislature directed that the liability standard of tort law should apply to restitution claims, there is a question of whether the standard should reflect the tort law at the time the statute was enacted or whether the criminal restitution statute was designed to incorporate changes in our tort law. Specifically, the question arises whether we should utilize the tort concepts recently adopted from the Restatement (Third) of Torts, *see Thompson*, 774 N.W.2d at 839, or statically apply concepts of prior tort law in existence at the time the statute was enacted in 1982. This specific question has not been addressed by the parties. We need not address the distinction in this case, however, as we think the result is the same under *Thompson* as under prior law. *See generally Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 849 (Iowa 2010) (noting similar results in analysis of duty under the Restatement (Third) of Torts and prior law).[4]

---

[4]There are two separate questions presented on the issue of whether to apply the causation standard of the Restatement (Second) of Torts § 431, at 428 (Am. Law Inst. 1965), which we generally recognized in our common law at the time of the adoption of the restitution statute, or the causation approach of the Restatement (Third) of Torts,

4. *Application of tort principles.* We begin with a brief review of the recent case of *Thompson,* 774 N.W.2d 829, and the application of *Thompson* principles to this case. In *Thompson,* a motorist lost control of his car on a rural gravel road and crashed upon encountering a trampoline that had been blown by wind from neighboring property onto the road. *Id.* at 831.

In *Thompson,* we considered the question of causation in negligence cases. *See id.* at 836. In so doing, we adopted the approach to causation adopted in the Restatement (Third) of Torts. *Id.* at 839. Following the Restatement (Third) of Torts, we noted that causation may be divided into two components, namely factual cause and scope of liability (proximate cause). *Id.* at 837. Determination of the scope of liability was characterized in *Thompson* as a fact-intensive inquiry that considers the risks that made the actor's conduct tortious and a determination of whether the harm at issue is a result of any of these risks. *Id.* at 838 (citing Restatement (Third) of Torts: Liab. for Physical Harm § 29 cmt. *d*, at 580, 584 (Am. Law Inst., Proposed Final Draft No. 1, 2005) now Restatement (Third) of Torts § 29 cmt. *d*, at 495–96, 499). In considering the scope-of-liability prong of causation, the Restatement (Third) notes in

---

which was adopted in *Thompson*, 774 N.W.2d at 839. The first question is whether the legislature intended the applicable statutory restitution law to be static, i.e., based on the common law of tort at the time of enactment, or whether the legislature intended to incorporate dynamically future changes in our tort law that occurred after the time of enactment. The second question is whether the legislature may delegate to the court the power to make future changes in the substance of statutory law through common law development without violating separation of powers. See Alexander Volokh, *Judicial Non-Delegation, the Inherent-Powers Corollary, and Federal Common Law*, 66 Emory L.J. 1391, 1391 (2017) (indicating nondelegation doctrine applies to any legislative delegate, including the courts); Margaret H. Lemos, *The Other Delegate: Judicially Administered Statutes and the Nondelegation Doctrine*, 81 S. Cal. L. Rev. 405, 407 (2008) (arguing that there is a core of legislative power that Congress cannot give away to the courts without violating separation of powers). The parties have not explored either question in their briefs.

a comment that "when scope of liability arises in a negligence case, the risks that make an actor negligent are limited to foreseeable ones." Restatement (Third) of Torts § 29 cmt. *j*, at 505).

We think the issue of potential damage to police vehicles as a result of a high-speed chase would be within the scope of liability in a negligence action against Shears. Certainly, a reasonable fact finder could conclude under the circumstances of this case that it was foreseeable that police would engage in an effort to apprehend the speeding Shears and that police vehicles could be damaged in the effort to bring Shears's vehicle to a halt. Most of the state and federal caselaw dealing with police vehicle crashes supports our conclusion. *See Washington,* 434 F.3d at 1267–70; *Reichow,* 416 F.3d at 804–05; *Donaby,* 349 F.3d at 1053–54; *Barnett,* 654 N.Y.S.2d at 919; *Dillon,* 637 P.2d at 608–09.

We do not find the Wisconsin cases cited by Shears very compelling. In *Haase,* the police vehicle burst into flames after the chase. 716 N.W.2d at 528. Police vehicles blowing up is not within the scope of risks that arise from a high-speed chase. And, the stop sticks in *Storlie* were purchased by the police department to do exactly what they did, namely, stop cars. 647 N.W.2d at 929. We think the question posed in *Storlie* is of an entirely different character than that presented here.

If we chose to analyze this case under the tort law in existence at the time of the enactment of our criminal restitution statute, we would not arrive at a different result. Our prior law utilized the now abandoned concept of "proximate cause." But foreseeability was a key component of the proximate cause analysis. *See, e.g., Benn,* 512 N.W.2d at 539. While the scope-of-liability analysis of *Thompson* may be cleaner and use different expressions, we do not believe a different result would occur in this case if we applied the proximate cause approach of prior tort law.

5. *Intervening or superseding cause.* Although he does not expressly use this label, Shears seems to be claiming that the cause of the damage to the police cars were the acts of the officers in performing a PIT maneuver to stop his vehicle and not his act of eluding. This amounts to an argument that the actions of the police in performing the PIT maneuver are an intervening or superseding cause that breaks the chain of causation and therefore prevents a court from imposing restitution on the offender.

A number of provisions in the Restatement (Second) of Torts dealt with intervening and superseding causes. *See* Restatement (Second) of Torts §§ 440–453, at 465–91 (Am. Law Inst. 1965). "An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed," *id.* § 441, at 465, while a superseding cause was a type of intervening force that relieved the original actor from liability for certain harms, *id.* § 440, at 465 ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."). The Restatement (Second) provided at least six different considerations for determining whether an intervening force is a superseding cause of harm. *Id.* § 442, at 467–68.

The Restatement (Second) contains a few rules on whether or not an intervening force would relieve the original actor from liability. First, "[w]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause." *Id.* § 442A, at 468. Second, an intervening cause that brings about the same harm as that risked by an original actor's negligent conduct does not relieve the original actor from liability, unless

the harm is intentionally caused by a third person and is not within the scope of the risk created by the negligent defendant's conduct. *Id.* § 442B, at 469. Third, "[t]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." *Id.* § 443, at 472. "The word 'normal' is not used . . . in the sense of what is usual, customary, foreseeable, or to be expected. It denotes rather the antithesis of abnormal, of extraordinary." *Id.* § 443 cmt. *b*, at 472–73. In addition, "[i]f the actor's negligent conduct threatens harm to another's person, land, or chattels, the normal efforts of the other or a third person to avert the threatened harm are not a superseding cause of harm resulting from such efforts." *Id.* § 445, at 475.

Before *Thompson,* we had approved the considerations identified in the Restatement (Second) of Torts for determining whether an intervening force is a superseding cause. *See Hollingsworth v. Schminkey*, 553 N.W.2d 591, 597 (Iowa 1996); *Iowa Elec. Light & Power Co. v. Gen. Elec. Co.*, 352 N.W.2d 231, 235–36 (Iowa 1984). We explained that "[i]t is clear that not all intervening forces become superseding causes" and "[t]o relieve an individual from liability, the intervening act or force must not have been a normal consequence of his or her acts or have been reasonably foreseeable." *Hollingsworth*, 553 N.W.2d at 597–98; *see also* Restatement (Second) of Torts § 443, at 472; *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 15 (Iowa 1977). Indeed, since at least 1905, we refused to find that even the "intervening act of an independent voluntary agency" would "arrest causation" where the act "was one which would ordinarily be expected to flow from the act of the first wrongdoer." *Burk v. Creamery Package Mfg. Co.,* 126 Iowa 730, 734, 102 N.W. 793, 795 (1905). "In other words," we also clarified, "an intervening force which falls squarely within the scope

of the original risk will not supersede the defendant's responsibility." *Hollingsworth*, 553 N.W.2d at 598; *see also Stevens v. Des Moines Indep. Cmty. Sch. Dist.*, 528 N.W.2d 117, 119 (Iowa 1995).

Under the law that existed at the time the restitution statute was adopted in 1982, we do not believe that the actions of the police in performing the PIT maneuver would constitute an intervening or superseding cause that would relieve Shears of liability. A reasonable fact finder could determine that the police officers' PIT maneuver was either a normal consequence of Shears's actions or one that would have been reasonably foreseeable to Shears. *Haumersen*, 257 N.W.2d at 15. In addition, damage to police vehicles brought about by a collision would be a normal consequence or reasonably foreseeable.

Under the Restatement (Third) of Torts, the law on intervening and superseding forces is significantly simplified. The Restatement (Third) simply provides that "[w]hen a force of nature or an independent act is also a factual cause of harm, an actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." Restatement (Third) of Torts § 34, at 569. According to a comment to that provision, "[i]n cases in which the source of the risk is an intervening act, the foreseeability of the intervening act will determine whether an actor's liability extends to any harm that occurs." *Id.* § 34 reporters' note cmt. *e*, at 588.

The provision on intervening and superseding causes in the Restatement (Third) is inextricably linked with the general causation limitation on liability for tortious conduct. *See* Restatement (Third) of Torts § 29, at 493 ("An actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious."). In fact, a comment to the provision on intervening and superseding causes provides

that the law on intervening and superseding forces is of "declining importance" and, "[w]ere it not for the long history of intervening and superseding causes playing a significant role in limiting the scope of liability, this Section would not be necessary." *Id.* § 34 cmt. *a*, at 570. This is principally because modern tort law has recognized "that there are always multiple causes of an outcome and that the existence of intervening causes does not ordinarily elide a prior actor's liability." *See id.* § 34 cmt. *a*, at 569.

Under the causation standard in the Restatement (Third) of Torts, as discussed above, we believe that the damage to the police vehicles would be within the scope of liability in a negligence action against Shears. In addition, a reasonable fact finder could determine that damage to police vehicles was foreseeable. Thus, even if the PIT maneuver was an independent act that was also a factual cause of the damage to the police vehicles, Shears would be liable for the damage. *See id.* § 34, at 569.

6. *Firefighter's rule.* Although not explicitly raised by the parties, there could be a question of whether recovery might be barred by what has been called "the firefighter's rule." Although there are many permutations in different jurisdictions, the firefighter's rule generally stands for the proposition that firefighters or police officers may not recover for injuries that occur in the ordinary course of their duties. *See Pottebaum v. Hinds*, 347 N.W.2d 642, 644–45 (Iowa 1984). According to a recent canvass of jurisdictions, more than thirty states have some version of the firefighter's rule, ten states have not addressed the issue, and the remaining states have either abolished or refused to adopt the rule. *Apodaca v. Willmore*, 392 P.3d 529, 537–39 (Kan. 2017).

In *Pottebaum*, 347 N.W.2d at 643, we adopted a version of the firefighter's rule. *Pottebaum* considered whether a police officer could

recover in a dramshop action against the operator of a tavern where an intoxicated tavern patron injured the officer while he was attempting to quell a disturbance. *Id.* We held that the rule barred recovery by firefighters and police officers "whenever their injuries are caused by the very wrong that initially required the presence of an officer in his official capacity and subjected him to harm." *Id.* In a later case, we limited application of the firefighter's rule by refusing to apply it to law enforcement activity unrelated to the violation that required the officer's presence. *Gail v. Clark*, 410 N.W.2d 662, 666 (Iowa 1987). We have reaffirmed application of the firefighter's rule in a 5–3 decision in a dramshop context in *Chapman v. Craig*, 431 N.W.2d 770, 773 (Iowa 1988) (en banc).

Although Shears has not raised the firefighter's rule in this case as a defense against imposition of restitution obligation, he does generally raise the question of whether he owes a common law duty to the city sufficient to support a restitution claim. Because the larger issue of duty has been raised, we conclude that the narrow issue of the applicability of the firefighter's rule is minimally preserved.

We conclude that the firefighter's rule has no application in this case. The firefighter's rule is a narrow doctrine that does not apply where subsequent acts of negligence or misconduct occur once the officer is on the scene. *Pottebaum*, 347 N.W.2d at 646. Here, the defendant's misconduct during the vehicle pursuit—driving at a high rate of speed, running stop signs, avoiding spike strips—were acts that take this case outside the scope of the firefighter's rule.

7. *Impact of statutory language related to restitution for emergency responses in drunk driving cases.* Finally, we consider the impact of language in the Iowa criminal restitution statute that expressly authorizes

restitution to government entities for emergency response in cases involving drunk driving. *See* Iowa Code § 910.1(4). The subsection provides for restitution authorized in Iowa Code section 321J.2(13)(*b*). That statutory provision in turn expressly provides for restitution of emergency response by a public agency in drunk driving cases. *See id.* Notably, however, the provision caps the amount of restitution at $500. *Id.* We explored the contours of this provision in *State v. Iowa District Court*, 889 N.W.2d 467, 468 (Iowa 2017).

The fact that the legislature expressly authorized restitution to public agencies for emergency response in drunk driving situations, but capped that restitution at $500, gives us pause. While the language utilized in Iowa Code section 910.1(3) broadly embraces tort concepts in civil cases, the explicit legislative authorization of government restitution in Iowa Code section 910.1(4) and Iowa Code section 321J.2(13)(*b*) is quite limited. It only involves drunk driving situations. And, it is capped at $500.

The question then is whether the express legislative adoption of limited restitution for emergency response costs in drunk driving cases implies the exclusion of other kinds of restitution by government agencies for emergency response. Phrased somewhat differently, does the limited restitution for emergency response costs for drunk driving evince a legislative intent to *expand* restitution under Iowa Code chapter 910, thus implying that generally such restitution is not available? Or, conversely, does the limited restitution available in drunk driving case demonstrate a legislative intent to *limit* at $500 what might otherwise be a more expansive restitution? In this case, the restitution sought by the City of Davenport far exceeds the $500 authorized for emergency responses for drunk driving.

We think the facts of this situation and the emergency response scenarios contemplated by Iowa Code section 910.1(4) are apples and oranges. Here, the crime of eluding generates a police chase that results in a crash involving the offender and police vehicles that is within the scope of liability under the Restatement (Third) of Torts and under our prior tort law. In the emergency response context, the public agency is responding to the results of the crime of drunk driving in the ordinary course of business. The causation element in the latter situation is one-step removed from the former. If the drunk driver bashed into an emergency response vehicle, we do not think the limitations of restitution in 910.1(4) would apply. As a result, we conclude that the provision of Iowa Code section 910.1(4) does not prevent a restitution to the City of Davenport under the different factual scenario posed in this case.

## IV. Conclusion.

For the above reasons, the decision of the district court is affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**